### PARAMOUNT BROKERS, INC., Plaintiff,

v.

### DIGITAL RIVER, INC., Defendant.

### Civ. No. H-00-1171.

United States District Court, D. Maryland.

Dec. 26, 2000.

---

David C. Tobin, Tobin, O'Connor & Ewing, Washington, DC, for Plaintiff.

John F. Dienelt, Margaret Ellen Kane Middleton, Hogan & Hartson, Washington, DC, Ian S. Ford, Hogan & Hartson, Baltimore, MD, Renee L. Jackson, Nicholas A.J. Vlietstra, Larkin, Hoffman, Daly and Lindgren, Ltd., Bloomington, MN, for Defendant.

## MEMORANDUM OPINION

HARVEY, Senior District Judge.

In this civil action, plaintiff Paramount Brokers, Inc. ("Paramount") has sued defendant Digital River, Inc. ("Digital River") for breach of contract and under several other contract theories, as well as for fraud. The complaint alleges that defendant Digital River executed a "Letter of Interest" in which it agreed to retain Paramount as its exclusive representative for purposes of developing and maintaining a vendor relationship between Digital River and Wal–Mart Stores, Inc. ("Wal–Mart"). Plaintiff asserts that Digital River breached this contract between the parties by directly selling software to Wal–Mart without using Paramount as its broker and without compensating Paramount for services rendered.

Pursuant to Scheduling Orders entered by the Court, the parties have engaged in extensive discovery. Presently pending before the Court is a motion for summary judgment filed by defendant Digital River. The parties have submitted lengthy memoranda and numerous exhibits in support of and in opposition to the pending motion, including affidavits and excerpts from various depositions taken during discovery. A hearing on the pending motion has been held in open court. For the reasons stated herein, defendant's motion for summary judgment will be granted.

## I

### Background Facts

Plaintiff Paramount is a Maryland corporation which represents vendors in their business relations with Wal–Mart. As of October 1998, plaintiff had entered into broker agreements with more than twenty clients and had been doing business with Wal–Mart for more than two years. Defendant Digital River is a Delaware corporation which sells software in electronic format by way of the internet and also sells traditional, boxed software products by conventional delivery services.

On October 16, 1998, Bernard Gagnon ("Gagnon"), Paramount's President, contacted Joe Huber ("Huber"), Digital Riv-

er's Strategic Accounts Manager, and discussed the possibility of Paramount's facilitating and managing a business relationship between Wal–Mart and Digital River. Gagnon also sent defendant a proposed broker agreement and a proposed Wal–Mart vendor agreement, as well as some business information concerning both Paramount and Wal–Mart. Later, Gagnon arranged for a meeting to be held on October 23, 1998 at Wal–Mart's headquarters in Arkansas, to discuss the proposed business relationship. This meeting was to be attended by Gagnon, Digital River representatives, and Scott Benedict ("Benedict"), a Wal–Mart executive.

On October 19, 1998, Draper Jaffray ("Jaffray"), Vice–President of Business Development for Digital River, spoke with Gagnon about the broker agreement and expressed concern regarding the five percent commission rate which Paramount proposed to charge.[1] Gagnon agreed to discuss the commission rate but refused to go forward with the October 23rd meeting unless defendant signed a letter of interest. To expedite the process, Gagnon sent defendant an example of another company's letter of interest which Paramount had on file. Using this letter of interest as a model, defendant Digital River drafted, signed, and mailed a letter of interest to plaintiff Paramount on October 20, 1998.[2] Defendant's letter of interest to Gagnon stated:

> This letter is to confirm our conversation that we are interested in discussing with you the possibility of you representing Digital River as a fulfillment vendor for Wal–Mart (Wal–Mart Stores, Wal–Mart Online, Sam's Club and Sam's Club Online). This representation is for providing online order fulfillments that are electronically transferred to Digital River from Wal–Mart to be drop shipped or electronically delivered to their customers. As we discussed it is our intention to have Paramount Brokers as our representative.

> While we are currently reviewing your broker agreement and reviewing the programs which you are proposing, Digital River will not sell products to Wal–Mart or its subsidiaries through this specific program until a broker agreement is finalized between Paramount Brokers, Wal–Mart and Digital River Inc.

> This understanding is subject to reaching an agreement by Wal–Mart, Digital River and Paramount Brokers in regards to pricing and commissions. All parties expressly understand that this agreement does not reflect us selling products to Wal–Mart either for purchases of product coming through standard means of doing business.

> As stated above, please accept this Letter of Interest to have Paramount Brokers as our representative to Wal–Mart.

Plaintiff asserts that prior to the October 23, 1998 meeting at Wal–Mart, Gagnon had emphasized to Jaffray and Huber that they needed to provide the executed broker agreement as soon as possible. It is alleged in the complaint that Jaffray and Huber agreed to mail the executed broker agreement within the next two days after the meeting. Gagnon claims that based on those assurances, he briefed and educated defendant's executives about how to do business with Wal–Mart.

The meeting in Arkansas with Benedict was positive, and all parties agree that Wal–Mart expressed interest in using Digital River as a vendor of software products. Benedict accordingly requested that Digital River complete and execute a standard Wal–Mart vendor agreement.

---

1. In his deposition, Gagnon states that he remembers that Jaffray proposed a rate of two to three percent at that time.

2. According to Gagnon's deposition, defendant "made very few changes" from the model letter of interest that had originally been taken from plaintiff's files.

In the days following the meeting, plaintiff and defendant continued to negotiate several aspects of a possible broker agreement between them. On October 26, 1998, Huber verbally proposed to Gagnon a one percent commission rate and a term of one year.[3] The next day, plaintiff sent defendant a revised broker agreement incorporating a one-year term and a one percent commission rate, which would increase to two percent after defendant's net sales of products to Wal–Mart reached $250,001. However, this second proposed broker agreement retained the original thirty-six month residual commission period, although reducing the commission rate for this period from five percent to two percent during the thirty-six month period.

On October 29, 1998, defendant, at Wal–Mart's request, completed and executed a Wal–Mart vendor agreement and sent this agreement to Benedict at Wal–Mart on October 30, 1998. On October 31, 1998, Huber verbally proposed additional changes to the revised broker agreement. In particular, he asked that the term of the agreement be reduced from one year to six months, that the "net sales" bonus be reduced from two percent to one percent, and that the residual commission period be stricken entirely. That same day Gagnon responded to defendant by way of a faxed letter stating "[u]nless Digital River is willing to sign the revised Broker Agreement ... by the close of business Monday [November 2, 1998], I regret to inform you that we will not be in a position to represent your company."

On November 2, 1998, defendant sent plaintiff an e-mail which requested the same changes to the revised broker agreement as were previously proposed by defendant on October 31, 1998. That same day, plaintiff responded with an e-mail,

stating in pertinent part "[w]e regret to inform you that your attached proposal is not acceptable to Paramount Brokers, Inc.... We are truly disappointed that we could not come to terms on an agreement, therefore, we cannot represent Digital River to Wal–Mart Online." When plaintiff contacted Benedict and told him that Paramount would not "be able to engage in Digital River business going forward," Benedict informed plaintiff that he had already been in direct communication with defendant. Several days later, on November 5, 1998, a representative of Wal–Mart signed the vendor agreement which Digital River had executed on October 29, 1998.[4] On December 9, 1998, an attorney for Paramount sent Digital River a letter asserting in pertinent part:

> To date, there has been no agreement between Digital River and Paramount Brokers, Inc. My client has now received confirmation that Digital River has executed a vendor agreement with Wal–Mart Online to provide products for use in their online program. This action is in direct conflict with the terms of the agreement dated October 20, 1998.
>
> Paramount Brokers, Inc. has indicated in the past a willingness to negotiate the outstanding issues in good faith so that all parties may benefit through this arrangement. However, if Digital River is not willing to resolve this matter, Paramount Brokers, Inc. will have no option but to institute litigation to enforce the October 20, 1998 agreement and, once sales begin online, for damages to which it is entitled.
>
> Please contact me immediately in regards to this matter.

Defendant never responded to this letter in any way. On March 15, 2000, plaintiff filed this civil action in the Circuit Court

---

**3.** Although the original proposed broker agreement contained a term of one year, it also provided for plaintiff to receive a "residual commission of FIVE PERCENT (5%) of all Net Sales of Product sold by Supplier to the Account, without regard for Broker's di-

rect involvement for a period of THIRTY–SIX (36) months after the termination of this Agreement ...."

**4.** See Exhibit No. 20 to Benedict's deposition, filed as plaintiff's Exhibit No. 7.

for Anne Arundel County. Thereafter, defendant removed the case to this Court pursuant to 28 U.S.C. § 1446. Diversity jurisdiction exists under 28 U.S.C. § 1332.

## II

### Plaintiff's Claims

In Count I of the complaint, plaintiff Paramount seeks recovery for breach of contract based upon the October 20, 1998 letter of interest. It is alleged that defendant's selling of products to Wal–Mart Online since December 1998 is a violation of specific language of the letter of interest.

In Count II, plaintiff seeks a recovery based upon a theory of *quantum meruit* and seeks compensation for the valuable services which it claims to have rendered to defendant. It is alleged that plaintiff was never compensated by defendant even though defendant received the benefit of plaintiff's services knowing that plaintiff expected to be paid.

Count III alleges that defendant breached the duty of good faith and fair dealing which is implied by Maryland law in all contracts. Specifically, it is alleged that defendant's duty arose from the October 20, 1998 letter of interest and that defendant breached its duty by failing to negotiate the terms of the broker agreement in good faith before selling products to Wal–Mart.

In Count IV, Paramount charges Digital River with fraud. It is alleged that defendant knowingly made false statements intended to induce plaintiff to arrange a meeting with Wal–Mart for the benefit of defendant. According to plaintiff, as a result of its reliance on these fraudulent statements, plaintiff set up a meeting that has subsequently caused it to suffer damages.

## III

### Summary Judgment Principles

A defendant moving for summary judgment bears the burden of showing the absence of any genuine issue of material fact and that it is entitled to judgment as a matter of law. *Barwick v. Celotex Corp.*, 736 F.2d 946, 958 (4th Cir.1984). Where, as here, the nonmoving party will bear the ultimate burden of persuasion at trial, "the burden on the moving party [at the summary judgment stage] may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

One of the purposes of Rule 56 of the Federal Rules of Civil Procedure is to require a plaintiff, in advance of trial and after a motion for summary judgment has been filed and properly supported, to come forward with some minimal facts to show that the defendant may be liable under the claims alleged. *See* F.R.Civ.P. 56(e). If the nonmoving party "fail[s] to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof," then "the plain language of Rule 56(c) mandates the entry of summary judgment." *Catrett*, 477 U.S. at 323, 106 S.Ct. 2548.

While the facts and all reasonable inferences drawn therefrom must be viewed in the light most favorable to the party opposing the motion, *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir.1985), "when the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). " 'A mere scintilla of evidence is not enough to create a fact issue; there must be evidence on which a jury might rely.' " *Barwick*, 736 F.2d at 958–59 (quoting *Seago v. North Carolina Theatres, Inc.*, 42 F.R.D. 627, 640 (E.D.N.C. 1966), *aff'd*, 388 F.2d 987 (4th Cir.1967), *cert. denied*, 390 U.S. 959, 88 S.Ct. 1039, 19 L.Ed.2d 1153 (1968)). Moreover, only dis-

puted issues of *material* fact, determined by reference to the applicable substantive law, will preclude the entry of summary judgment. "Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In the absence of the necessary minimal showing by the plaintiff that the defendant may be liable under the claims alleged, the defendant should not be required to undergo the considerable expense of preparing for and participating in a trial. *See Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548; *Anderson*, 477 U.S. at 256–57, 106 S.Ct. 2505. Indeed, the Fourth Circuit has stated that, with regard to motions for summary judgment, the district courts have "an affirmative obligation ... to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves–Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir.1987) (quoting *Catrett*, 477 U.S. at 323–24, 106 S.Ct. 2548).

Applying these principles to the facts of record here, this Court has concluded that defendant's motion for summary judgment must be granted as to all counts of the complaint. Since the facts of record here "taken as a whole could not lead a rational trier of fact to find for the non-moving party," there is no genuine issue for trial. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348.

## IV

### Applicable Principles of Law

■ It is black letter law in Maryland that "[a] contract is an agreement which creates an obligation ... and such agreement may be defined as the concurrence of two or more persons in a common intent to affect their legal relations ...." *Abt Associates, Inc. v. JHPIEGO Corp.*, 104 F.Supp.2d 523, 531 (D.Md.2000) (*quoting Post v. Gillespie*, 219 Md. 378, 384, 149 A.2d 391 (1959)). "A party's intention will be held to be what a reasonable person in the position of the other party would conclude the manifestation to mean." *Beckenheimer's Inc. v. Alameda Assoc. Ltd. Partnership*, 327 Md. 536, 547, 611 A.2d 105 (1992). "It is essential that the minds of the parties be in agreement on terms in order for a contract to be established." *Marmott v. Maryland Lumber Co.*, 807 F.2d 1180, 1184 (4th Cir.1986).

■ Letters of intent and negotiations ordinarily do not constitute binding contracts and will not be enforced by the courts. *Phoenix Mutual Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership*, 734 F.Supp. 1181, 1187 (D.Md.1990), *aff'd* 937 F.2d 603 (4th Cir.1991). In *Abt*, this Court outlined five factors for determining whether the facts of a case revealed an intent by the parties to a letter of intent to be bound, namely: "(1) the language of the agreement; (2) the context of the negotiations; (3) the existence of open terms; (4) partial performance; and (5) the custom of such transactions." *Id.* at 531 (*citing Teachers Ins. & Annuity Ass'n v. Tribune Co.*, 670 F.Supp. 491, 498–503 (S.D.N.Y. 1987)). *See also, Phoenix*, 734 F.Supp. at 1187. After applying these factors to the facts of record in both *Abt* and *Phoenix*, this Court concluded that no binding final agreement was ever reached in either of those cases. *Abt*, 104 F.Supp.2d at 532; *Phoenix*, 734 F.Supp. at 1187.

■ Maryland recognizes that every contract imposes a duty of good faith and fair dealing in its performance. *Abt*, 104 F.Supp.2d at 534 (*citing Food Fair Stores, Inc. v. Blumberg*, 234 Md. 521, 534, 200 A.2d 166 (1964)). This duty "simply prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract," *Parker v. The Columbia Bank*, 91 Md.App. 346, 366, 604 A.2d 521 (1992). However, a plaintiff seeking a recovery for breach of contract may not in Maryland assert a separate claim for breach of the covenant of good faith and fair dealing implied in that contract. *Abt*, 104 F.Supp.2d at 534.

Three elements must be established by a plaintiff in order to sustain a claim for *quantum meruit:* "(1) [a] benefit conferred upon the defendant by the plaintiff; (2)[a]n appreciation or knowledge by the defendant of the benefit; and (3)[t]he acceptance or retention by the defendant of the benefit under such circumstances as to make it inequitable for the defendant to retain the benefit without the payment of its value." *Everhart v. Miles,* 47 Md.App. 131, 136, 422 A.2d 28 (1980). "[U]nder Maryland law, a party may collect under *quantum meruit* only if he had a reasonable expectation of being paid." *Omni Jet Trading, Inc. v. Heerensperger,* 121 F.3d 699, 1997 WL 543381, at *3 (4th Cir.1997) (*citing Cleaves v. Sharp & Dohme,* 166 Md. 546, 171 A. 374 (1934)).

In *Abt,* the plaintiff had argued that "as a result of defendant's termination of the negotiations and subsequent enjoyment of the benefits of the services conferred upon it by plaintiff, a sustainable claim of *quantum meruit* may be asserted." *Id.* at 535. However, this Court found that argument to be "meritless" because "plaintiff did not reasonably expect to be compensated for its pre-award services, inasmuch as there was no guarantee that defendant would receive the award. Services and costs incurred by plaintiff during the pre-award period amounted to no more than the costs of doing business." *Id.*

In order to prevail in an action seeking a recovery for fraud, a plaintiff must prove: (1) that the defendant made a false representation to the plaintiff, (2) that the falsity was either known to the defendant or that the representation was made with reckless indifference as to its truth, (3) that the misrepresentation was made for the purpose of defrauding the plaintiff, (4) that the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) that the plaintiff suffered compensable injury resulting from the misrepresentation. *Abt,* 104 F.Supp.2d at 536 (*citing Nails v. S & R,* 334 Md. 398, 415, 639 A.2d 660 (1994)). "Fraud must be proven by clear and convincing evidence." *Id.* (*citing Everett v. Baltimore Gas and Electric Company,* 307 Md. 286, 300, 513 A.2d 882 (1986)).

Although "[m]any cases involving issues of fraud are not suited for disposition by way of a motion for summary judgment because of the need for factual development," this Court in the *Abt* case granted defendant's motion for summary judgment as to plaintiff's fraud claim. *Id.* at 536–37. This Court stated that "[p]laintiff is here seeking to prove fraud inferentially by asserting that defendant's statements … were never realized and that they therefore must have constituted fraud. Proof of this sort does not amount to clear and convincing evidence of knowingly fraudulent misrepresentations or of misrepresentations made with reckless indifference as to their truth." *Id.* at 537.

## V

### Count I—Breach of Contract

The key document at issue here is the "Letter of Interest" dated October 20, 1998. That letter from Jaffray was sent to and approved by Gagnon. As conceded by plaintiff, this letter was in fact a "letter of intent" as a document of that sort is commonly known in commercial transactions. *During negotiations like those conducted by representatives of the plaintiff and representatives of the defendant in this case, the parties often sign a letter of intent when they are attempting to reach agreement on a later formal written contract. See Phoenix,* 734 F.Supp. at 1183–84. *Parties engage in such negotiations not because they intend that the process itself will constitute the agreement, but because they desire and intend to create an eventual writing that will set forth the final terms satisfactory to both sides in every respect. Id.* at 1189; *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 83 (2d Cir. 1985).

Plaintiff argues that the circumstances and express terms of the letter of

interest in this case constituted a legal and binding contract between the parties. This Court must disagree. On the record here, this Court concludes as a matter of law that no binding and enforceable agreement was ever reached between plaintiff Paramount and defendant Digital River. Evidence of record does not exist to indicate that the parties intended to bind themselves to an enforceable contract whereby Paramount would be paid commissions over a period of years based on sales made by Digital River to Wal–Mart.

By its very terms, the letter itself disclosed the clear intent of the parties, namely that no contract would become effective until a later broker agreement was "finalized." An express condition of the letter of interest was that the parties' understanding was "subject to reaching an agreement by Wal–Mart, Digital River and Paramount Brokers in regards to pricing and commissions." But no such agreement was ever reached by these three parties. The letter confirmed the earlier "conversation" between the parties that Digital River was interested "in discussing with you the *possibility*" of Paramount representing Digital River as a vendor for Wal–Mart. (Emphasis added). As this Court stated in *Phoenix:*

> Letters of intent and negotiations ordinarily do not constitute binding contracts and will not be enforced by the courts, in part because "the financial community does not regard [a letter of intent] as a binding agreement, but rather, an expression of tentative intentions of the parties." *Dunhill Securities Corp. v. Microthermal Applications, Inc.,* 308 F.Supp. 195, 198 (S.D.N.Y. 1969).

Paramount's own representatives acknowledged on several occasions that the parties were unable to agree on pricing and commissions terms. In his letter of October 31, 1998 to Huber, Gagnon stated that he was "very disappointed that we have been unable to come to terms with a Broker Agreement to represent Digital to Wal–Mart Online." In his e-mail of November 2, Gagnon indicated that he was "truly disappointed that we could not come to terms on an agreement" and stated that Paramount therefore could not represent Digital River in connection with the Wal–Mart business. Benedict of Wal–Mart was similarly told that Paramount would not be able "to engage in Digital River business going forward." Paramount's attorney, in his letter of December 9, stated: "there has been no agreement between Digital River and Paramount Brokers, Inc."

Both parties rely on the *Teachers* decision in which the district court held that a letter of intent which expressly stated that it would be binding was an enforceable contract. Plaintiff points out that the Court in *Teachers* concluded that a binding agreement between the parties had resulted from their execution of a letter of intent. But the facts here are quite different from those present in the *Teachers* case. In that case, the letter of intent expressly stated that it would be binding. 670 F.Supp. at 493. There is no such express statement in the letter of interest at issue in this case. Nor was there any such language in the letter of intent in the *Phoenix* case or in the correspondence between the parties in the *Abt* case. In both *Phoenix* and *Abt,* this Court applied the *Teachers* factors and determined that the documents at issue did not constitute binding contracts between the parties.

Applying the five factors of the *Teachers* case to evidence of record here, this Court concludes that the parties did not intend to be bound until a formal written agreement was executed. The letter of interest expressly so stated. The context of the negotiations between the parties indicated that both of them were striving to reach agreement on a formal "finalized" broker agreement. In the e-mail from plaintiff dated October 31, 1998, plaintiff stated that it was truly disappointed "that we could not come to terms on an agreement, . . ." Critical payment terms to be included in the final agreement remained

open. Following discussions back and forth, defendant was only willing to enter into a broker agreement whereby the term during which plaintiff would be receiving commissions would be reduced from one year to six months and whereby the residual thirty-six month commission period would be stricken entirely. Those terms were not acceptable to Paramount which gave Digital River a deadline of November 2, 1998 for accepting its terms or Paramount would no longer be in a position to represent Digital River. This deadline was not met by Digital River.

There was no partial performance here by the parties. In arranging the meeting with Wal–Mart on October 23, plaintiff was merely engaging in preliminary efforts to induce defendant to enter into the proposed broker agreement whereby plaintiff would be representing defendant in future dealings with Wal–Mart. These efforts were no more than what a party would normally do as a cost of doing business for which it could not reasonably be expected to be compensated. *Abt,* 104 F.Supp.2d at 532–33.

Finally, the custom of a transaction of this sort indicates that a letter of intent like the one at issue here does not constitute a finalized broker agreement. The broker agreement contemplated by the parties in this case is the type of final contract which parties would normally reduce to a writing before they would bind themselves legally.

Plaintiff argues that the parties agreed in the letter of interest that Digital River would not sell products to Wal–Mart until a broker agreement was finalized between the three parties. According to plaintiff, Digital River breached this agreement by selling products to Wal–Mart in the absence of a finalized broker agreement. But the understanding in question was expressly "subject to reaching an agree-

ment by Wal–Mart, Digital River and Paramount Brokers in regards to pricing and commissions." Since no agreement was ever reached in regards to pricing and commissions, Digital River was free to make its own arrangements with Wal–Mart once it became clear that negotiations with Paramount were at an end.

When Paramount gave Digital River a deadline and refused to negotiate further after November 2, its own actions made it impossible for a finalized broker agreement to be reached by the parties. Digital River was accordingly released from the understanding stated in the letter of interest that it would not sell products to Wal–Mart during negotiations with Paramount relating to the terms of a broker agreement between them. Once it decided that it would no longer deal with Digital River, Paramount itself undertook a search for another distributor to meet Wal–Mart's needs.[5]

Wal–Mart did not formally execute the vendor agreement between it and Digital River until November 5, 1998. This was after the deal with Paramount had foundered. By that time, Paramount had finally refused to enter into a broker agreement with Wal–Mart and Digital River, and the letter of interest no longer had any effect. When it became evident that no three-way agreement was possible, Wal–Mart decided to enter into a vendor agreement with Digital River alone without the participation of Paramount.

Plaintiff's reliance on *Channel Home Centers v. Grossman,* 795 F.2d 291 (3rd Cir.1986) is misplaced. In that case, the Third Circuit held that the letter of intent at issue was enforceable as a mutually binding obligation to negotiate in good faith. *Id.* at 300. The lessor had specifically agreed to withdraw the store from the rental market and then negotiate the leasing transaction to completion. *Id.* The

**5.** Paramount attempted to interest Benedict in doing business with Tech Data, another computer software vendor. However, Benedict, in an e-mail dated January 6, 1999, requested that Paramount not pursue this or any other similar relationships because he felt that Wal–Mart had secured all its needed resources for the computer software category.,

Third Circuit determined that defendant had promised in the letter of intent to withdraw the store from the market prior to negotiations but had failed to do so. *Id.* at 299–300. Accordingly, the Court found that the parties had intended to be bound by the letter of intent and that valid consideration for the obligation to negotiate in good faith had been given. *Channel* is inapplicable here because in this case there was no mutually binding obligation of the parties supported by valid consideration. Moreover, the Third Circuit in *Channel* was applying Pennsylvania law. Under Maryland law, an agreement to negotiate a contract is unenforceable. *First Nat'l Bank of Maryland v. Burton, Parsons & Co.*, 57 Md.App. 437, 448–50, 470 A.2d 822 (1984).

Plaintiff accuses defendant of bad faith in making unreasonable demands during their negotiations. But it is not bad faith for a party to bargain to its own economic advantage. *Phoenix,* 734 F.Supp. at 1190. It was hardly unreasonable for Digital River to refuse to enter into an agreement requiring it to pay commissions to Paramount over a four year period of time during which Digital River would be selling its products to Wal–Mart. The services to be rendered by Paramount after a broker agreement and a vendor agreement had been executed by the parties were minimal. Since substantially all of such services could readily be performed by Digital River itself, there was no economic advantage for Digital River to pay compensation to Paramount based on future sales to Wal–Mart.

In sum, the record in this case indicates that the parties could not agree on the terms of a finalized broker agreement. No final, binding writing was ever executed by the parties. As a matter of law, this Court finds and concludes that the parties never, throughout the course of their negotiations, reached an agreement which required Digital River to pay commissions to Paramount over a period of years. Accordingly, summary judgment in favor of defendant will be granted as to the claim asserted by plaintiff in Count I of the complaint.

## VI

### *Count II—Quantum Meruit*

In Count II of the complaint, plaintiff seeks a recovery under a theory of *quantum meruit.* Plaintiff argues that there. is evidence supporting such a claim because facts of record indicate that a benefit was conferred upon defendant, that defendant knew that plaintiff expected to be paid, and that defendant retained the benefit.

Under Maryland law, a plaintiff may recover under the theory of *quantum meruit* only if it had a reasonable expectation of being paid. *Omni Jet Trading, Inc.,* 1997 WL 543381 at *3. A broker may recover under a theory of *quantum meruit* if his efforts have been contributed under circumstances from which an expectation of payment may be inferred. *Cleaves,* 166 Md. at 551, 171 A. 374.

On the record here, this Court concludes that plaintiff's *quantum meruit* claim must fail. It cannot be inferred on this record that plaintiff had a reasonable expectation of being paid for services rendered during the period of time when the parties were attempting to negotiate a finalized broker agreement. As a broker which had engaged in prior negotiations of the sort involved in this case, plaintiff knew from the outset that if no final agreement was ever reached by the parties, lost time and effort would result. *Phoenix,* 734 F.Supp. at 1191. Parties seeking to conclude a business deal like this one obviously assume risks of this sort. *Id.*

Furthermore, plaintiff had no reasonable expectation of being paid a commission over a period of four years while defendant was making sales of its products to Wal–Mart. As a result of the unsuccessful negotiations between the parties, Paramount knew that Digital River had refused to pay commissions in the amount sought

by Paramount for the number of years requested. When Digital River refused to accept the payment terms demanded, plaintiff could not reasonably have expected to be paid the commissions in question during future years. Any compensation which plaintiff could have reasonably expected to have received would have arisen only as a result of the services rendered by plaintiff after a finalized broker agreement was executed. No such services were ever rendered.

For these reasons, this Court is satisfied that no claim based on a theory of *quantum meruit* can be asserted by plaintiff in this case. Accordingly, summary judgment in favor of defendant will also be entered as to Count II of the complaint.

### VII

#### *Count III—Duty of Good Faith And Fair Dealing*

 Count III of the complaint asserts that defendant breached its duty of good faith and fair dealing. According to Paramount, Digital River breached that duty by failing to negotiate with Paramount in good faith.

Maryland courts have not recognized a separate cause of action for breach of the duty of good faith and fair dealing. *Abt*, 104 F.Supp.2d at 534. In this particular case, the Court has concluded that the parties did not enter into a binding agreement. There can be no breach of the duty of good faith and fair dealing in this case because no such duty can be implied when there is no binding agreement between the parties. *Westburn Limited Corporation v. Scott Paper Company*, 1993 WL 15675 (D.Md.1993) at *4.

In arguing that a claim of breach of defendant's duty of good faith and fair dealing may be asserted in this case, plaintiff relies on *Eastern Shore Markets, Inc. v. J.D. Associates Ltd. Partnership*, 213 F.3d 175 (4th Cir.2000). According to plaintiff, the opinion of the Fourth Circuit in that case establishes the legitimacy of

asserting a separate claim for breach of the implied covenant of good faith and fair dealing. Plaintiff misreads *Eastern Shore*. The Fourth Circuit did no more than note that Maryland law recognizes an implied covenant of good faith and fair dealing "in all negotiated contracts." *Id.* at 182. Here, there was no negotiated contract, and a separate claim of breach of the implied covenant of good faith and fair dealing can therefore not be asserted in this case. *Abt*, 104 F.Supp.2d at 534.

For these reasons, this Court concludes that defendant is also entitled to the entry of summary judgment in its favor as to Count III.

### VIII

#### *Count IV—Fraud*

 In Count IV of the complaint, plaintiff seeks a recovery for fraud. However, the pending civil action is essentially a contract case governed by principles of contract law recognized by Maryland courts. Plaintiff's attempt to add a tort claim in a case of this sort is suspect. *21st Century Properties v. Carpenter Insulation*, 694 F.Supp. 148, 151 (D.Md.1988).

Maryland courts have emphasized that fraud exists only when the speaker had (1) an intent to defraud and (2) knowledge that his statement was false at the time that it was made. *Edell & Associates v. Law Offices of Peter Angelos*, 106 F.Supp.2d 790, 797 (D.Md.2000) (*citing Miller v. Fairchild Industries, Inc.*, 97 Md.App. 324, 343–44, 629 A.2d 1293 (1993)). Under Maryland law, plaintiff Paramount has the burden here of proving by clear and convincing evidence that representatives of Digital River purposely intended to defraud Paramount by knowingly making false statements. *See Miller*, 97 Md.App. at 343–44, 629 A.2d 1293.

Applying these principles to the facts of record here, this Court concludes that plaintiff's claim of fraud must also fail. The allegedly fraudulent statements were made in the course of contract negotiations between two business entities. The statements of defendant's representatives relied

upon by plaintiff did no more than indicate a desire on the part of defendant that the negotiations would be fruitful. The statements at issue were made during the parties' negotiations. They were not fraudulent because they related to the future course of the business relationship between the parties. Representations as to what will be performed or will take place in the future are regarded as predictions and hence are not fraudulent. *Miller,* 97 Md.App. at 342, 629 A.2d 1293. Proof that defendant's expectations were never realized does not amount to clear and convincing evidence of knowingly fraudulent misrepresentations.

Moreover, plaintiff has not proved by clear and convincing evidence that it had a right to rely on defendant's statements regarding defendant's desire to solidify a business relationship with plaintiff. The negotiations between the parties were rife with comments concerning the tentative nature of the parties' relationship and the fact that there would be no binding contract absent the parties' ability to reach agreement on pricing and commissions. From the outset, defendant had expressed its concern as to plaintiff's desired commission rate and the length of the period of years when defendant would be required to pay commissions. Ultimately, it was this disagreement which caused plaintiff to break off negotiations. Defendant had every right to engage in "hard bargaining, designed to serve its own financial interest." *Phoenix,* 734 F.Supp. at 1190. When the evidence here is considered in the context of the parties' negotiations in this case, plaintiff has not shown that it had the right to rely on the alleged statements as false and fraudulent misrepresentations.

For these reasons, summary judgment in favor of defendant will also be entered as to Count IV.

## IX

### Conclusion

In sum, it is apparent that the parties were unable to agree on the final terms of a broker agreement which would be acceptable to both sides. Since no binding contract resulted, plaintiff Paramount is not entitled to recover damages for breach of contract or under the other contract theories alleged. Moreover, plaintiff has suffered no losses because of any tortious conduct on the part of defendant.

For all the reasons stated, defendant's motion for summary judgment will be granted as to all four counts of the complaint. An appropriate Order will be entered by the Court.